# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Onree Norris,

                    Plaintiff,        Case No. 1:18-cv-02163

v.                                  Michael L. Brown
                                       United States District Judge

Jermaine Hicks, David Cody,
David Lemacks, Jerome Moore,
Steven Parrish, Unidentified
Members of the Flint Circuit Drug
Task, and Unidentified Members
of the Henry County Special
Response Team,

                    Defendants.

_____/

## ORDER

This case arises out of the execution of a search warrant at the wrong address. Plaintiff Onree Norris, whose home was mistakenly raided, sued Defendants Jermaine Hicks, David Cody, David Lemacks, Jerome Moore, and Steven Parrish for violating his Fourth Amendment rights. Defendants now move for summary judgment based on qualified immunity. (Dkts. 55; 59.) The Court grants Defendants' motions. Plaintiff also moves to amend his complaint by adding Agent Eric Kendig

as a defendant. (Dkt. 50.) The Court denies Plaintiff's motion as untimely.

## I. Background

Defendants Hicks, Lemacks, Moore, and Parrish work as agents for the Flint Circuit Drug Task Force ("Task Force"). (Dkt. 72 at 6:3–24.) The Task Force is comprised of about seven agents from different law enforcement agencies within Henry County, Georgia. (Dkt. 52 at 7:17–8:5, 35:23–36:11.) It specializes in drug-related investigations. (Dkt. 73 at 6:1–5.) Defendant Cody is the Commander of the Henry County Sheriff's Office Special Response Team ("Response Team"). (Dkt. 55-5 ¶ 2.) The Response Team has twenty-one members and specializes in executing search and arrest warrants at residential properties. (Dkts. 51-1 at 9:12–17; 71 at 7:17–18, 15:2–12.)

In March 2016, the Task Force began investigating Gemar "Jay" Watkins based on a tip that he was selling illegal drugs from his home at 305 English Road in McDonough, Georgia. (Dkt. 59-2 ¶ 3; 59-5 at 3.) The Task Force received similar reports throughout 2017, including from witnesses who bought drugs from Watkins or transported drugs on his behalf. (Dkt. 59-5 at 4–5.) These witnesses stated, and police databases

confirmed, that Watkins lived at the 305 English Road address. (*Id.* at 3–5.) One of the witnesses also stated that Watkins pointed a gun at, and threatened to kill, two parents who confronted him at that address. (*Id.* at 5.)

In September 2017, Defendants Moore and Parrish tried to conduct surveillance at 305 English Road but were immediately chased away by three or four people standing in front of the property. (Dkts. 59-5 at 4–5; 70 at 6:14–7:11.) Men at the property got in a car and followed Defendants Moore and Parrish at high speed, "pretty much" bumper-to-bumper, for about ten miles. (Dkts. 59-5 at 4–5; 70 at 6:1–13; 73 at 15:18–16:7.) Based on his view of the property during the surveillance attempt, Defendant Parrish believed the home at 305 English Road looked "habitable" and "typical to the other houses in the area." (Dkt. 70 at 8:6–12.)

In January 2018, a confidential informant told Task Force agents that he regularly purchased drugs from Watkins at 305 English Road. (Dkt. 59-5 at 5–6.) The informant also said that Watkins and his associates carry guns at the residence, that Watkins's friends and family live nearby and warn Watkins when police are around, that Watkins uses

surveillance cameras at his house, and that "everyone is scared of [Watkins] because he has a violent reputation and constantly threatens people with being shot." (*Id.* at 5–6.) Later that month, Task Force agents obtained a video in which Watkins and an associate used a firearm to threaten and assault an elderly man. (*Id.* at 6.)

In late January 2018, Defendant Hicks and another Task Force agent drove by 305 English Road. (Dkt. 59-2 ¶ 10.) They saw seven or eight people there, including someone standing on the front porch. (*Id.* ¶ 12.) They also saw several cars in the yard. (Dkt. 69 at 12:3–9.) The house was an "off-white" color and had a black roof. (*Id.* at 12:15–18, 13:13–16.) Overall, the agents thought it looked like a "normal house," an "active residence," and certainly not an "abandoned house." (Dkts. ¶ 59-2 ¶ 12; 69 at 47:13–48:15.) Defendant Hicks described this drive-by surveillance as "lucky" because the property was usually too dangerous for officers to visit. (Dkt. 69 at 18:3–11.)

A day or so later, the Task Force Defendants worked with a confidential informant to complete a controlled purchase of drugs from Watkins's friend at 305 English Road. (Dkts. 59-5 at 7; 73 at 17:5–10.) The Task Force Defendants did not accompany the informant to the

property, however, "due to counter surveillance measure[s]" used by Watkins and his associates. (Dkt. 59-5 at 7.)

On January 31, 2018, Defendant Hicks applied for and obtained a no-knock search warrant for the residence at 305 English Road. (Dkt. 59-2 ¶ 9.) The warrant described the home as "a one story single-family residence, with off white siding and a black roof." (Dkt. 59-6 at 2.) It further stated that the residence has "a black mailbox" on which the house address and Watkins' name are displayed. (*Id.*) The warrant also included directions to the property. (*Id.*)

Given the "violence threat" involved in visiting 305 English Road, the Task Force obtained the assistance of the Response Team to execute the search warrant. (Dkts. 55-8 ¶ 7; 59-2 ¶ 17; 73 at 7:18–22.) No one from the Response Team had previously been to 305 English Road. (*See* Dkt. 69 at 53:3–13; 71 at 10:11–13.) The Response Team usually conducts drive-by surveillance of a target property before executing a warrant but was unable to do so here because of the risk of getting spotted and attacked by Watkins and his associates. (Dkts. 51-1 at 14:10–20, 26:1–6; 69 at 53:3–13.)

In the early evening of February 8, 2018, agents from the Response Team and Task Force — including Defendants — met at a law enforcement office to prepare for execution of the search warrant. (Dkts. 52 at 19:5–22; 55-8 ¶ 12; 59-2 ¶ 18.) Everyone involved in the raid was present, including all twenty-one agents from the Response Team. (Dkts. 69 at 24:21–25; 71 at 7:17–8:3, 10:21–23.) Defendant Hicks delivered a PowerPoint presentation that included an aerial image of the home's location on a map, driving directions to the home, an overview of events leading to the search warrant, Watkins' profile, and the following list of "hazards:"

- **Weapons** – Possible Firearms inside the residence.
- Target has children however, C.I. stated they have not seen children at location.
- C.I. stated they have seen several people at the location with firearms.
- Target posted a video on social media where a [sic] elderly male was assaulted with a firearm.

(Dkts. 55-1 at 2–5, 7; 69 at 24:10–20.)

Defendant Hicks described 305 English Road as Watkins's residence, "off-white" in color, and surrounded by cars in the yard. (Dkts. 69 at 35:21–36:24; 71 at 37:16–20.) He also stated that the search warrant — which described the house in further detail — was "available

6

for review." (Dkt. 55-1 at 8.) It appears Defendant Cody was the only Response Team agent who reviewed the warrant. (Dkts. 62 at 3, 10–11; 71 at 13:2–18.) He made sure it was signed, confirmed it authorized a no-knock entry, and confirmed that the address in the warrant matched the address identified in the PowerPoint presentation. (Dkt. 71 at 13:7–13, 16:2–17:6.) But he did not read the warrant "word for word all the way through," and there is no evidence he read the warrant's description of the house at 305 English Road. (*Id.* at 15:19–16:15.) Because the Response Team relies on the Task Force to describe the target property and to take them there, Defendant Cody typically does not review the warrant's property description before completing a raid. (*Id.*; *see* Dkt. 52 at 42:3–7 (Task Force responsible for "ensuring that the officers who were going to serve the warrant on a target location know where that location is").)

Defendant Hicks explained during the meeting that the Task Force was responsible for securing the grounds around the target residence and vehicles in the yard. (Dkts. 55-1 at 11; 59-2 ¶ 24.) The Response Team was responsible for entering and securing the house. (Dkts. 55-1 at 11; 59-2 ¶ 22.) Lieutenant Marlowe led the Task Force while Defendant

Cody led the Response Team. (Dkts. 55-1 at 11; 69 at 28:14–22.) Although Defendant Cody exercised "overall tactical control," he delegated authority to Response Team Agent Eric Kendig to lead the team's execution of his tactical plan. (Dkts. 51-1 at 19:17–21:9; 55-1 at 11; 71 at 20:13–21:16.) This meant Defendant Cody would oversee the operation from outside the target residence while Agent Kendig led the team's entry into the house. (*Id.*)

Once Defendant Hicks finished his presentation, Defendant Cody provided tactical instructions to the agents so that everyone understood their role in the operation. (Dkts. 51-1 at 14:8–10; 70 at 25:10–26:4; 73 at 38:11–39:13.) The Response Team followed Defendants Hicks and Lemacks to 305 English Road. (Dkts. 59-2 ¶¶ 27–28; 69 at 40:9–10.) Defendants Moore and Parrish (and a few others) drove separately to the surrounding woods — about a quarter-mile away — to look for and apprehend anyone fleeing the target residence. (Dkt. 70 at 11:1–13:19, 22:12–22.) The agents knew there was another "drug house" in the area — with which law enforcement had had "previous run ins"— so they were "worried" about people running between the two homes. (*Id.* at 13:9–19; *see* Dkt. 73 at 33:2–25.)

Led by Defendants Hicks and Lemacks, the Response Team parked in a dirt path leading to the side of 305 English Road. (Dkts. 58; 59-2 ¶ 28.) A few agents parked directly in front of the house. (Dkts. 51-1 at 16:12–22; 52 at 26:9–24.) The house sat in a large dirt clearing in an otherwise wooded area, with abandoned cars and parts scattered around the grounds. (Dkt. 58.) Several agents thought the grounds looked like a junkyard. (*See, e.g.*, Dkts. 70 at 8:18–24; 73 at 15:5–10.) The sun was setting, and it was starting to get dark. (Dkt. 70 at 12:24–13:3.)

After exiting their vehicles, the agents threw two flash grenades that exploded near the house. (Dkts. 58; 71 at 22:19–23:21.) The explosions were very loud and created a bright flash, followed by smoke. (Dkt. 58.) The agents threw the grenades to distract and disorient the "numerous people with guns" they expected to encounter at the property. (Dkts. 51-1 at 18:1–9; 70 at 15:2–19; 71 at 8:9–9:4, 23:19–21.)

Immediately after the explosions, a few agents approaching from the front of the house apprehended and handcuffed a man in the yard. (Dkt. 58.) The rest of the Response Team, led by Defendant Cody, walked towards the side of the house with their guns raised. (Dkt. 58.) As they got closer to the house, Defendant Cody and Agent Kendig realized it was

severely run down and dilapidated. (Dkts. 55-1 at 43:19–25; 71 at 25:5–14.) This dilapidation was not apparent from a distance, including from the road or the dirt path on which the agents had parked. (Dkts. 69 at 47:9–48:15; 71 at 26:6–13; 72 at 39:18–40:8.) The house had no windows, no doors, no electricity, no running water, no appliances, no carpet, and no sheet rock walls. (Dkts. 51-1 at 43:19–25; 69 at 49:4–17; 71 at 17:19–18:16.) There were holes on the side of the building, and car parts lying inside. (Dkts. 51-1 at 43:19–25; 71 at 18:11–12, 25:9–12.) Both agents believed it was uninhabitable, abandoned, and a "storage out-building" rather than a house. (Dkts. 51-1 at 43:19–25; 55-5 ¶ 5; 71 at 17:19–18:16.) Since they understood the search warrant was for an occupied residence, they mistakenly concluded the structure was not 305 English Road. (Dkts. 51-1 at 43:19–25; 71 at 17:9–18:16, 29:24–25, 35:9–19.)

As the group moved through the back yard, Defendant Cody slowed down and the rest of the Response Team continued past him through some trees to a nearby yellow house whose lights were on. (Dkts. 52 at 41:16–20; 58.) This house was about forty yards from 305 English Road, separated only by a thin line of bare trees. (Dkts. 58; 59-2 ¶ 36.) It, too, sat on a large grassy-dirt clearing surrounded by trees. (Dkt. 58.) The

color and design of the two houses looked similar, and someone had told Defendant Cody that the target residence was yellow. (Dkts. 51-1 at 23:24–25; 58; 71 at 14:13–25, 36:8–13.) Although Defendant Cody "wasn't sure" this second house was the target residence, "[t]hings were moving really fast" and he assumed Agent Kendig and the rest of the team "acquired information that justifiably led them to proceed to the second structure." (Dkts. 51-1 at 44:1–4; 55-5 at 3; 71 at 29:16–25.) The Response Team spent about thirty seconds walking towards and behind 305 English Road before continuing past it to the second house. (Dkt. 58.) They never stopped or communicated by radio. (Dkts. 58; 71 at 33:11–34:17.)[1]

After deploying two flash grenades outside the second house, agents from the Response Team — including Agent Kendig — forcibly entered the residence and apprehended Plaintiff who was inside. (Dkts. 58; 71 at 36:14–18; 39:7–11.) Defendant Cody entered the residence shortly thereafter. (Dkt. 55-8 ¶ 19.) The Task Force — which had been focusing on securing the surrounding grounds and vehicles — then informed the

---

[1] Defendant Cody testified that, for safety reasons, the Response Team does not communicate over the radio during an operation (absent a clear emergency) until they secure the house. (Dkt. 71 at 33:11–24, 35:1–8.)

Response Team that they had raided the wrong house.  (Dkt. 71 at 39:21–25; *see, e.g.*, Dkts. 55-4; 59-2 ¶¶ 32–34, 40, 43; 72 at 40:9–16.)  The address they entered was 30**3** English Road (Plaintiff's residence), not 30**5** English Road (Watkins's drug house).  (Dkt. 71 at 29:12–25.)  Defendant Cody later worked with Plaintiff to repair the damage caused by the agents to Plaintiff's home.  (Dkt. 55-8 ¶ 20.)

In May 2018, Plaintiff sued Defendants under 42. U.S.C. § 1983 for searching his home and seizing his person without a search warrant or probable cause in violation of the Fourth, Fifth, and Fourteenth Amendments.  (Dkt. 1.)  On April 1, 2019, about two months after discovery closed and almost a year into the case, Plaintiff moved to amend his complaint by adding Agent Kendig as a defendant.  (Dkt. 50.)  The next day, Defendants moved for summary judgment based on qualified immunity.  (Dkts. 55; 59.)

## II.   Discussion

### A.   Plaintiff's Motion to Amend

Plaintiff moves to add Agent Kendig as a defendant.  Plaintiff's motion is untimely.

On July 30, 2018, the Court's Scheduling Order (Dkt. 14) approved the parties' Joint Preliminary Report and Discovery Plan (Dkt. 11), which states: "Amendments to the pleadings submitted LATER THAN THIRTY (30) DAYS after [July 27, 2018] will not be accepted for filing, unless otherwise permitted by law." (Dkt. 11 at 8.) The Scheduling Order also incorporates the Local Rules, which state that, subject to inapplicable exceptions, "all . . . motions must be filed WITHIN THIRTY (30) DAYS after [July 27, 2018] unless the filing party has obtained prior permission of the Court to file later." LR 7.1(A)(2), NDGa.; (*see* Dkts. 11 at 7 – 8; 14). Plaintiff filed his motion to amend on April 1, 2019, more than seven months after the Scheduling Order's deadline. *See Goolsby v. Gain Techs., Inc.*, 362 F. App'x 123, 127, 131 (11th Cir. 2010) (scheduling order approved the parties' joint preliminary report and discovery plan, and thereby incorporated the amendment deadline listed in that filing).

"[W]hen a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998). Rule 16 provides that the scheduling order "may be modified only for good cause," Fed. R. Civ. P. 16(b)(4), which "precludes

modification unless the schedule cannot be met despite the diligence of the party seeking the extension," *Sosa*, 133 F.3d at 1418. "This means that the likelihood of obtaining permission to amend diminishes drastically after the court enters a scheduling order with deadlines for amendments that have expired." *Kozyrev v. Ponomarenko*, 2020 WL 977635, at *1 (S.D. Fla. Feb. 28, 2020).[2]

Plaintiff was not diligent here. His motion to amend comes almost a year into the case, more than seven months after the Scheduling Order's deadline, almost two months after the close of discovery, and one day before the (extended) deadline for filing summary judgment motions. The Eleventh Circuit has repeatedly found that delays of this length preclude amendment. *See Pugh v. Kobelco Const. Mach. Am., LLC*, 413 F. App'x 134, 136 (11th Cir. 2011) (denying motion to amend filed "more than three months after the expiration of the deadline for amending pleadings"); *Goolsby*, 362 F. App'x at 128, 131 (denying motion to amend

---

[2] Plaintiff's brief "does not address good cause under Rule 16(b), but focuses instead upon the liberal amendment standard set out in Federal Rule of Civil Procedure 15(a)." *Sosa*, 133 F.3d at 1419. "However, because [Plaintiff's] motion to amend was filed after the scheduling order's deadline, []he must first demonstrate good cause under Rule 16(b) before [the Court] will consider whether amendment is proper under Rule 15(a)." *Id.*

filed "nearly two months *after* the parties' deadline for amending the pleadings"); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1242 (11th Cir. 2009) (denying motion to amend filed five months after scheduling order's deadline and "a few weeks" after fact discovery closed); *see also Lowe's Home Ctrs., Inc. v. Olin Corp.*, 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions.").

Plaintiff claims "[t]he extent of Mr. Kendig's involvement in the raid was unknown pre-discovery." (Dkt. 50 at 6.) That may be, but Plaintiff during discovery obtained significant information about Agent Kendig's involvement and still waited months to seek an amendment. For example, on November 20, 2018 — more than *four months* before filing the motion to amend — Plaintiff elicited the following testimony from Defendant Cody at his deposition:

> Q. And then you said that there were team members within the Henry SR Team who had control over certain other aspects. Is that --
>
> A. They are the team -- they are the -- or he, for this one, is a team leader. They go in the house. He controls what's

going on in the house. He controls the movement to the house. I delegate that authority to our team leader.

Q. Who is that with this particular warrant execution?

A. Sergeant Kendig.

Q. Would that be Eric Kendig?

A. Yes.

Q. What specific responsibility did you delegate to Sergeant Kendig with respect to the execution of the warrant at 305 English Road?

A. He's the team leader, the entry team leader.

Q. The entry team leader. So, just in layman's terms, what does that mean?

A. Means he controls the movement of people going to the house. He controls who goes into the house. I let him -- he makes up his own list of people that are -- he is going to the house with. So --

Q. Okay. And he would have created a list in this particular case?

A. Right.

(Dkt. 71 at 21:9–22:11.) This testimony put Plaintiff on notice of Agent Kendig's central role in the raid. Defendant Cody also offered testimony about Agent Kendig's position in the Response Team's tactical formation during the raid. (*Id.* at 36:14–18.) And, on January 10, 2019, Plaintiff

elicited further testimony about Agent Kendig from Defendant Moore. (Dkt. 73 at 9:4–16.) Plaintiff even deposed Agent Kendig on January 24, 2019, but still waited more than two months before moving to add him as a defendant. (Dkt. 51-1.) This is not diligence. *See S. Grouts*, 575 F.3d at 1242 ("Southern Grouts lacked diligence, at the very least, because it waited until August 5, 2008 to file a motion to amend its complaint with information that it had known over a month before.").[3]

Because Plaintiff's "proposed amendment was based on facts that were, or should have been, within his own knowledge" well before he

---

[3] Plaintiff claims he did not receive "the original transcript" of Agent Kendig's deposition until March 26, 2019. (Dkt. 50 at 2.) But Plaintiff does not say whether he is responsible for this delay, as he was for other delayed transcripts in this case. (*See* Dkt. 48.) Indeed, Defendants previously moved to extend the summary judgment deadline because "plaintiff's counsel advised the court reporter to delay preparing the transcripts for [certain] depositions" based on his expectation that the case would settle. (*Id.* at 2.) Even if Plaintiff was not responsible for the delayed transcript, he still could have sought amendment based on what he learned during Agent Kendig's deposition (whether or not he had "the original transcript") as well as Defendant Cody's revealing deposition more than two months earlier. At the very least, he should have promptly sought any additional information he needed to determine whether an amendment was warranted. *See S. Grouts*, 575 F.3d at 1241 n.3 ("The lack of diligence that precludes a finding of good cause . . . can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order.").

moved to amend in April 2019, he has not shown good cause to modify the Scheduling Order and his motion to amend is denied as untimely. *Pugh*, 413 F. App'x at 136.[4]

## B.   Defendants' Motions for Summary Judgment

### 1.   Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "it might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361.

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is

---

[4] Even if Plaintiff had shown good cause, the Court would deny his motion to amend as futile because, for many of the same reasons explained below, Agent Kendig is entitled to qualified immunity for his participation in the raid on Plaintiff's home. *See Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.").

no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A moving party meets this burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The movant, however, need not negate the other party's case. *Id.* at 323.

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48.

Throughout its analysis, the court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable

inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## 2. Legal Standard for Qualified Immunity

"Section 1983 allows persons to sue individuals or municipalities acting under the color of state law for violations of federal law." *Hill v. Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015).[5] "When defending against a § 1983 claim, a government official may assert the defense of qualified immunity." *Moore v. Sheriff of Seminole Cty.*, 748 F. App'x 229, 232 (11th Cir. 2018). An official asserting this defense must show that he "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The burden then "shifts to the plaintiff to

---

[5] Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity . . . ." 42 U.S.C. § 1983.

show that the defendant is *not* entitled to qualified immunity." *Id.* This requires plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* Plaintiff's two-part burden need not be "analyzed sequentially; if the law was not clearly established, [the court] need not decide if the Defendants actually violated the Plaintiff's rights." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

To establish a violation of clearly established law, plaintiff must show "the preexisting law was so clear that, given the specific facts facing a particular officer, one must say that every reasonable official would have understood that what he is doing violates the Constitutional right at issue." *Gates v. Khokhar*, 884 F.3d 1290, 1302 (11th Cir. 2018). "[T]he clearly established law must be particularized to the facts of the case" and not "defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). This is because the "the dispositive question is whether the violative nature of [defendant's] *particular* conduct is clearly established." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018). "Such specificity is especially important in the Fourth Amendment context, where the

Supreme Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.*

"The critical inquiry is whether the law provided the [officials] with fair warning that their conduct violated the Fourth Amendment." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). "Fair warning is most commonly provided by materially similar [binding] precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose." *Gates*, 884 F.3d at 1296; *see Birmingham Bd. of Educ.*, 904 F.3d at 1260 n.1 (only binding cases can create clearly established law).

> [A] pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.

*Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015). "Exact factual identity with a previously decided case is not required," *Coffin*, 642 F.3d at 1013, but "[m]inor variations between cases may prove critical,"

*Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010); *see Merricks*, 785 F.3d at 559 ("Minor variations in some facts . . . might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents."). Ultimately, the unlawfulness of defendant's conduct must be "apparent" from the binding precedent on which plaintiff relies. *Coffin*, 642 F.3d at 1013.

If plaintiff cannot point to a materially similar binding precedent, he can establish fair warning only if defendant's conduct violated federal law "as a matter of obvious clarity." *Id.* at 1014; *see Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017). This requires plaintiff to show that (1) "the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful," or (2) "the case law that does exist is so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Gaines*, 871 F.3d at 1209; *see Gates*, 884 F.3d at 1296–97 ("Authoritative judicial decisions may establish broad principles of law that are clearly applicable to the conduct at issue," or "it may be obvious

from explicit statutory or constitutional statements that conduct is unconstitutional").

Obvious clarity cases are "rare" and constitute "a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Coffin*, 642 F.3d at 1014–15; *Fils*, 647 F.3d at 1291. This is because "[a] reasonable official's awareness of the existence of an abstract right . . . does not equate to knowledge that *his* conduct infringes the right." *Coffin*, 642 F.3d at 1015. And "public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Id.* "Thus, if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.*

Properly applied, "[t]he qualified immunity defense provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Merricks*, 785 F.3d at 558. It "recognizes the problems that government officials like police officers face in performing their jobs in dynamic and sometimes perilous situations." *Id.* It gives those officials "breathing room to make reasonable but mistaken judgments," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011), and allows them to "carry

out their discretionary duties without the fear of personal liability or harassing litigation," *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019). Given these policy goals and the broad scope of the defense, "courts should think long and hard before stripping defendants of immunity." *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004).

### 3. Analysis

Plaintiff explicitly concedes that Defendants Hicks, Lemacks, Moore, and Parrish are entitled to qualified immunity against Plaintiff's claims. (Dkt. 62 at 1.) The only remaining issue is whether Defendant Cody is also entitled to summary judgment based on qualified immunity. The Court finds that he is.[6]

The parties do not dispute — nor could they — that Defendant Cody was acting within his discretionary authority when he and his team executed the search warrant at Plaintiff's house. *See Hartsfield v.*

---

[6] Defendants are entitled to summary judgment on Plaintiff's Fifth and Fourteenth Amendment claims because "[t]he allegations at issue here center on an unlawful search and seizure and should be analyzed under the Fourth Amendment, not the due process clauses of either the Fifth or Fourteenth Amendment." *Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents From Birmingham, Alabama Task Force*, 225 F. App'x 781, 783 n.1 (11th Cir. 2007). The Court thus confines its qualified immunity analysis to Plaintiff's Fourth Amendment claim against Defendant Cody.

*Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("no doubt" that officers executing a search warrant at the wrong address "were acting within their discretionary authority"). The burden thus lies with Plaintiff to show that Defendant Cody's involvement in the raid violated clearly established law.

Plaintiff claims *Hartsfield* is a "materially similar" precedent that provided Defendant Cody with fair warning that his conduct violated the Fourth Amendment. (Dkt. 62 at 8–10.)[7] In *Hartsfield*, the deputy sheriff went with a confidential informant to the target residence. He waited outside while the informant purchased marijuana from a woman inside. He obtained a search warrant for the residence later that day. At approximately 2:30 p.m. the next day, he mistakenly led law enforcement agents to the wrong house to execute the search warrant. He forcibly opened the door with a battering ram, and the other agents went inside. The court noted that "absent probable cause and exigent circumstances,

---

[7] Plaintiff also relies on *Treat v. Lowe*, 668 F. App'x 870 (11th Cir. 2016), and *White v. Mclain*, 648 F. App'x 838 (11th Cir. 2016), but "[u]npublished cases . . . do not serve as binding precedent . . . and cannot be relied upon to define clearly established law." *Birmingham Bd. of Educ.*, 904 F.3d at 1260 n.1. Even if they could, *Treat* and *White* would not change the conclusions reached by the Court in this order.

a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error." *Hartsfield*, 50 F.3d at 955. The court then found that the deputy sheriff was not entitled to qualified immunity because "all reasonable police officers should have known that [his] acts—searching the wrong residence when he had done *nothing* to make sure he was searching the house described in the warrant—violated the law." *Id.* at 955 (emphasis added). The "*Hartsfield* Court . . . expressly rested its holding on the fact that [the deputy sheriff] did nothing" to make sure he was at the right house. *White*, 648 F. App'x at 842; *see also Treat*, 668 F. App'x at 871 (no qualified immunity because agents "did nothing to ascertain the correct address").

The Eleventh Circuit has instructed district courts to "compare the facts of the case before the court . . . with those cases that the party opposing the motion contends show the clearly established nature of the law." *Merricks*, 785 F.3d at 559. After conducting that analysis, the Court finds that this action differs materially from *Hartsfield*. First, the *Hartsfield* defendant "did nothing to make sure he was searching the [right] house," even though he easily could have done so by checking the

warrant in his possession. *Hartsfield*, 50 F.3d at 955. In contrast, Defendant Cody did take steps to identify the target residence, even though it was the Task Force's responsibility to take him to the correct address. He participated in the pre-execution briefing, reviewed the search warrant, confirmed that the address in the warrant matched the address identified by the Task Force, spoke to someone about the color of the target residence, reviewed an aerial image of the house's location on a map, followed the Task Force to 305 English Road, and inspected the house with a flashlight before concluding it did not fit the description he was given at the pre-execution briefing. These efforts may have proved "ineffectual, but he made them, which is more than [the *Hartsfield* defendant] did." *White*, 648 F. App'x at 842.

Second, in *Hartsfield*, the only evidence of wrongdoing at the target residence was the sale of marijuana by a woman. The raid was "carefully staged and the officers were accompanied by representatives of the media," demonstrating the absence of any "exigent circumstances." *Hartsfield*, 50 F.3d at 952. Here, Defendant Cody knew Watkins had a violent criminal history, expected "numerous people with guns" (and potentially children) at the target residence, believed Watkins would

know they were arriving due to counter-surveillance measures, worried that a nearby drug house would get involved in the raid, and knew his team apprehended a man on the grounds immediately after they arrived. His team also deployed two flash grenades within seconds of arriving, which revealed their presence and increased their vulnerability to any threats at the residence.

Third, and relatedly, the *Hartsfield* agents immediately went to the wrong address. Here, Defendant Cody and his team initially approached the correct address but reasonably believed it was not the target residence because it looked uninhabitable and abandoned and they had been told to look for an occupied home (potentially with children). By the time they realized the structure was abandoned, there was a need to act quickly given the dangers expected at the property and the likelihood that their presence had already been exposed. As the *Hartsfield* court cautioned, courts must "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 955. This caution applies with significant force here because the process of executing the warrant at 305 English Road was particularly dangerous and difficult.

Fourth, in *Hartsfield*, it was the defendant who "led the officers to the wrong address." *Id.* at 952. Here, the Task Force was responsible for taking Defendant Cody and his team to the target residence. Defendant Cody testified that he relied on the Task Force to adequately describe the house and to take him there. He further testified that, once the operation began, he believed his team "acquired information that justifiably led them to proceed to the second structure." This belief was not unreasonable because his team members were significantly further forward than him, Agent Kendig — who exercised delegated authority to control the entry — was part of that team, the team participated in the pre-execution briefing and were privy to the same operational information he had, the operation was in full swing and at a dynamic stage, and his team were highly trained and experienced in executing search warrants. (*See* Dkt. 55-5.) Indeed, Defendant Cody testified that his team engages in forty or fifty high-risk operations each year. (*Id.*) Just as the *Hartsfield* court found that other officers "acted []reasonably in following [the deputy sheriff's] lead" to the wrong house, the Court here concludes that Defendant Cody acted reasonably in trusting his

team's judgment under the dynamic circumstances they faced. *Hartsfield*, 50 F.3d at 956.

Fifth, the *Hartsfield* defendant "had been to the proper residence the day before the search and had procured the search warrant based upon his own observations supervising a drug buy at [the address]." *Id.* at 955. In contrast, Deputy Cody and his team had never visited 305 English Road before the raid because it was too dangerous to do so. Nor were they shown any clear pictures of the residence. They also had no role in procuring the search warrant.

Sixth, the evidence in *Hartfield* "showed that the houses were located on different parts of the street, separated by at least one other residence, and that their appearances were distinguishable" including because one house "had a fence around it" and the other "had junk cars and the like strewn outside." *Id.* at 952, 955. Here, the houses were immediately next to each other, had a similar color and design, and were not clearly separated by a fence or otherwise. It is true that 305 English Road had several cars and parts scattered around the yard (and that Plaintiff's home did not) but, given the proximity and lack of clear separation between the houses, this difference does not by itself carry

significant weight. The most salient difference only confirmed Plaintiff's house was the right one: it looked like an occupied residence (which is what the team were told to look for) and 305 English Road did not.

Seventh, while the *Hartsfield* raid "took place during daylight hours" at about 2:30 p.m., *id.* at 955, Defendant Cody's team executed the search warrant in the evening when "it was starting to get dark," (Dkt. 70 at 12:24–13:3).

These factual differences, viewed in the aggregate, are significant. A "reasonable, similarly situated official could believe that [they] *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful." *Merricks*, 785 F.3d at 559. The Court therefore concludes that the unlawfulness of Defendant Cody's conduct was not "apparent" or "beyond debate" based on *Hartsfield*. *al-Kidd*, 565 U.S. at 741; *Coffin*, 642 F.3d at 1013. Plaintiff has not shown that Defendant Cody violated clear law established in *Hartsfield*.[8]

---

[8] Plaintiff's brief includes a footnoted string cite to eight cases, with no explanation of their similarity or relevance to this action. (Dkt. 62 at 10 n.8.) This is insufficient to show that Defendant Cody violated clearly established law. *See Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the

Having failed to cite a materially similar binding precedent, Plaintiff's only remaining hope for avoiding qualified immunity is the "obvious clarity" doctrine. But that doctrine is extremely limited in scope and Plaintiff has not meaningfully asserted it applies here.[9] Even if he had, the Court finds it does not. For the same reasons that this action differs materially from *Hartsfield*, the Court concludes this is not "the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 n.18 (11th Cir. 2002); *see Willingham v. Loughnan*, 321 F.3d 1299, 1302 (11th Cir. 2003) (absent materially similar precedent, "official conduct [must] be so egregious that further warning and notice beyond the general statement

---

brief"); *Zuma Seguros, CA v. World Jet of Delaware, Inc.*, 2017 WL 4237874, at *5 n.5 (S.D. Fla. Sept. 25, 2017) ("[A] footnote is the incorrect place for substantive arguments on the merits . . . . [A party] cannot drop a cryptic remark only in a footnote and expect a Court to evaluate it as a new substantive argument.").

[9] Plaintiff simply asserts, in conclusory fashion, that "this is an obvious case in which Cody was palpably unreasonable" because "the two residences are easily distinguishable such that no reasonable officer could confuse the two." (Dkt. 62 at 13.) Plaintiff's other arguments do not explicitly invoke the obvious clarity doctrine.

of law found in the Constitution or the statute or the caselaw is unnecessary").

As explained above, Defendant Cody took several steps to identify the target residence. His team executed the warrant under dangerous and dynamic circumstances, and as it was starting to get dark. They had never visited or seen the house before (through no fault of their own), which was unusual. The Task Force was responsible for describing the house but incorrectly said it was an occupied residence. By the time the Response Team realized 305 English Road did not match this description, there was a need to act quickly. Defendant Cody reasonably relied on his team, including Agent Kendig to whom he delegated authority to lead entry into the home. Plaintiff's house was next to, and not dissimilar from, 305 English Road. And, unlike 305 English Road, Plaintiff's house actually looked like an occupied residence, which is what the team were told to look for. Given these facts, the Court cannot say Defendant Cody's conduct was unconstitutional — under "general principle[s] of law" — "as a matter of obvious clarity." *Coffin*, 642 F.3d at 1014–15.

Defendant Cody is entitled to qualified immunity — and therefore summary judgment — because Plaintiff has not shown that he violated

clearly established law.[10]  The remaining Defendants are also entitled to summary judgment because Plaintiff concedes they are protected by qualified immunity.  The Court therefore grants Defendants' motions for summary judgment.

## III.  Conclusion

The Court **DENIES** Plaintiff Onree Norris' Motion for Leave to Amend Complaint and to Add Party Defendant (Dkt. 50).

The Court **GRANTS** Defendants David Cody, David Lemacks, Jerome Moore, and Steven Parrish's Motion for Summary Judgment (Dkt. 55).

The Court **GRANTS** Defendant Jermaine Hicks's Motion for Summary Judgment (Dkt. 59).

---

[10] To the extent Plaintiff claims Defendant Cody is liable under Section 1983 in his supervisory capacity, Defendant Cody is also protected by qualified immunity.  *See Hill v. Orange Cty. Sheriff*, 666 F. App'x 836, 841 (11th Cir. 2016) ("Officers facing supervisory liability claims are entitled to qualified immunity unless the plaintiff states a violation of a clearly established constitutional right."); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous.").

**SO ORDERED** this 16th day of March, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE